**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>TAHJAI THOMAS<br>*Defendant*. | Case No. 1:26-mj-250 |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Patrick Maxwell, being duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1. This affidavit is submitted in support of a criminal complaint and arrest warrant for Tahjai THOMAS ("THOMAS"). Based on the information set forth in this Affidavit, I submit there is probable cause to believe that from at least January 2023 up to and including November 2025, in the Eastern District of Virginia and elsewhere, THOMAS conspired with Dontavious WHITAKER, D'Moni MOTEN, Edward WRIGHT III, and others known and unknown to launder monetary instruments, in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Monetary Instruments), and conducted financial transactions to conceal or disguise the nature, location, source, ownership, and control of property represented to be the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering).

2. I submit there is also probable cause to believe that between on or about April 21-22, 2025, in the Eastern District of Virginia and elsewhere, the defendant did knowingly and intentionally transfer, possess, and use, without lawful authority, the means of identification of

another person, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit bank fraud (18 U.S.C. § 1344), in violation of Title 18, United States Code, Section 1028A.

3.     I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

4.     I have been a sworn law enforcement officer in Arlington County, Virginia since 2007. I am currently assigned to the Organized Crime Section – Drug Enforcement Vice Unit of the Arlington County Police Department. I am currently deputized with the Drug Enforcement Administration (DEA) Northern Virginia Mass Transportation Initiative (NVMTI). In this role, I am responsible for the investigation of criminal organizations, including drug-trafficking and money-laundering organizations. I have investigated hundreds of criminal offenses and received convictions from those investigations in the Courts of Arlington County, Virginia, and Federal Courts in the Eastern District of Virginia. I have previously been certified as an Expert Witness in the General District Courts of Arlington County, Virginia regarding narcotics possession and distribution. I have received specialized training in narcotics recognition, interdiction, and prosecutions, cell phone investigative techniques, cyber investigations, and extensive other training from various police academies, the DEA, and other federal agencies. During my employment with the Arlington County Police Department and tenure with as a Task Force Officer, I have gained knowledge in the use of various investigative techniques, including but not limited to: the utilization of wiretaps, physical surveillance, undercover agents, confidential informants, cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations,

the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants. In addition, I am familiar with the search, examination, and exploitation of data obtained from cellular phones, computers, and internet-service and communications providers, including social media, electronic mail, and online / web-based messaging applications.

5. Based on this and other investigations, coupled with information from other law enforcement agents, as well as my training and experience, I am aware that:

   a. Drug trafficking is lucrative, and drug trafficking organizations employ a myriad of methods to launder the proceeds from the sale of drugs. Due to the large quantities of cash that drug traffickers possess from drug transactions, drug traffickers commonly seek to conceal and launder the illicit proceeds of their activity through the use of both illegal and legal business enterprises and also rely upon complex money laundering networks to assist them in this task;

   b. A series of convoluted transactions and quick swaps between financial accounts, whether traditional bank accounts or cryptocurrency wallets, is a strong indication that the movement of funds was performed in a manner meant to conceal the nature, source, control, and/or ownership of the proceeds of a specified unlawful activity;

   c. Shell companies, which are business entities with no significant assets or operations, are sometimes used in the money laundering context because their lack of real business operations and deliberately complex structures provide for a veil of secrecy, allowing criminals to obscure the illegal origin of their funds.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation. Furthermore, any statements excerpted or summarized from recorded conversations, including those that are quoted, are subject to further revision for clarification and/or accuracy. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## RELEVANT STATUTES

7. Under 18 U.S.C. § 1956(h), it is unlawful for any person to conspire to commit any offense defined in §§ 1956 or 1957. A violation of § 1956(h) is subject to the same penalties as the offense which was the object of the conspiracy.

8. Under 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for any person, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, to conduct, or attempt to conduct, such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

9. Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), the manufacture, sale, or distribution of controlled substances constitute "specified unlawful activity" for purposes of § 1956.

10. Under 18 U.S.C. § 1028A, it is unlawful for any person, during and in relation to any felony violation enumerated in subsection (c) of § 1028A, to knowingly transfer, possess, or

use, without lawful authority, a means of identification of another person. Pursuant to 18 U.S.C. § 1028A(c)(5), a "felony violation enumerated in subsection (c)" includes any provision contained in chapter 63 of Title 18, United States Code. Chapter 63 includes 18 U.S.C. § 1344(2) (Bank Fraud), under which it is unlawful for any person to knowingly execute, or attempt to execute, a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representation, or promises.

## PROBABLE CAUSE

### I. VIOLATIONS OF 18 U.S.C. § 1956(h) (CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS) AND 18 U.S.C. § 1956 (a)(1)(B)(i) (CONCEALMENT MONEY LAUNDERING)

#### A. Narcotics Conspiracy Investigation Background

11. In 2025, the Drug Enforcement Administration ("DEA") began investigating a drug trafficking organization ("DTO") associated with Dontavious WHITAKER, also known as "Doe," ("WHITAKER"), D'Moni MOTEN, also known as "Mulu," "Lu," and "Moni" ("MOTEN"), Edward WRIGHT III, also known as "Lil E," and other unindicted co-conspirators for the distribution of counterfeit pressed pills containing fentanyl (hereinafter, "fentanyl pills")[1] in the Eastern District of Virginia and elsewhere.

[1] Law enforcement officers commonly find narcotics dealers selling round blue pills imprinted with "M" and "30" which mimic the markings associated with oxycodone 30mg pills manufactured by Mallinckrodt Pharmaceutical. The widespread distribution of the counterfeit pills is marked by popular culture terminology such as "blues," "M-30s," "Perc's," and "Perc-30's." "Perc" is a commonly used slang reference that is short for "Percocet" which is a name brand prescription pain killer that contains oxycodone and acetaminophen. It is common in the Eastern District of Virginia, and throughout the United States, for counterfeit pressed pills containing fentanyl and/or heroin or other opioids to be manufactured to look like legitimate

12.    Investigation revealed that WHITAKER and MOTEN were involved in a conspiracy to distribute fentanyl pills, and other controlled substances, from at least December 2021 through November 12, 2025.  Fentanyl pills seized during the course of the conspiracy contained fentanyl, heroin, and Carfentanil.  Over the course of the conspiracy, WHITAKER and MOTEN conspired to distribute at least 36 kilograms of a mixture and substance containing fentanyl.  WRIGHT joined the conspiracy to distribute fentanyl pills at least as early as January 2024.

13.    On February 6, 2026, WHITAKER and MOTEN pled guilty in the Eastern District of Virginia to three-count Criminal Informations charging them with (1) conspiracy to distribute and possess with the intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of Carfentanil, a Schedule II substance and analogue of fentanyl, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, and one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841 and 846; (2) possession with intent to distribute and attempted possession with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of Carfentanil, a Schedule II substance and analogue of fentanyl, in violation of 21 U.S.C. § 841; and (3) possession of a firearm in furtherance of a drug trafficking

---

oxycodone pills.  Historically, counterfeit pressed M30 pills contained primarily fentanyl; however, in recent years, pill seizures have revealed pills containing heroin, nitazene-class synthetic opioids, morphine derivatives, and other opioids.  On occasion, confidential sources or undercover officers will negotiate for the purchase of fentanyl pills and later lab testing will reveal the pills did not contain fentanyl but contained another opioid substance, such as heroin.  For consistency, the term "fentanyl pills" will be used throughout this affidavit when referring to counterfeit pressed pills containing fentanyl and/or other opioids.

offense, in violation of 18 U.S.C. § 924(c) (1:26-cr-19; 1:26-cr-20 (LMB)). On June 4, 2026, WRIGHT pled guilty in the Eastern District of Virginia to a three-count Criminal Information charging him with (1) conspiracy to distribute and possess with the intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of Carfentanil, a Schedule II substance and analogue of fentanyl, 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, and one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841 and 846; (2) possession with intent to distribute and attempted possession with intent to distribute fentanyl, a Schedule II substance, in violation of 21 U.S.C. § 841; and (3) possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g) (1:26-cr-97 (LMB)).

14. Subsequent analysis of additional investigative materials, including financial records associated with various coconspirators, as well as review of device extractions, revealed that WHITAKER, MOTEN, WRIGHT, and THOMAS conspired to launder proceeds related to the distribution of controlled substances. The facts presented in this affidavit are intended to show that THOMAS willingly participated in and conducted financial transactions for the purpose of assisting WHITAKER, MOTEN, and WRIGHT in concealing the source and/or destination of funds received for their narcotics sales, knowing that said funds constituted proceeds associated with drug trafficking.

**B. <u>THOMAS' Role in DTO</u>**

15. Review of device extractions associated with coconspirators, in addition to information obtained from law enforcement seizures and other investigative materials, revealed that THOMAS played a multi-faceted role within the Whitaker DTO. THOMAS was involved in the purchase and rental of vehicles associated with the DTO, the location and payment of various

rental properties used as residences and stash locations for the DTO, and, most significantly, laundering of proceeds earned by the DTO.

*i. <u>November 12, 2025, Search Warrants and Seizures</u>*

16. On November 12, 2025, the DEA, along with other law enforcement agencies, executed federal search warrants[2] on numerous locations and vehicles associated with the conspiracy. During a search of an address at McCauley Way in Lorton, Virginia ("MCCAULEY RESIDENCE"), law enforcement encountered WHITAKER and THOMAS in one of the bedrooms. Underneath the bed in that bedroom, law enforcement located a loaded Glock 26 semi-automatic handgun bearing serial number BNKY919 with an extended magazine inserted and round in the chamber. The firearm was sitting next to license plates for a Mercedes (the "Mercedes") WHITAKER had previously been observed operating on numerous occasions and from which WHITAKER conducted suspected drug transactions. On the bedside table next to the bed, law enforcement located a car key to a Dodge Durango rental car (the "Durango"), WHITAKER's ID, nearly $50,000 in U.S. currency, as well as several high-end jewelry items. Another bedroom contained WRIGHT, a loaded firearm, and approximately 33 fentanyl pills. In the kitchen of the residence, law enforcement located approximately one pound of suspected marijuana and marijuana extract.

17. The Mercedes was found at a car dealership in Woodbridge with approximately 1,000 fentanyl pills inside. Later analysis confirmed the pills contained approximately 108.18 grams of a mixture and substance containing Carfentanil. A subsequent search of the Durango,

[2] These search warrants were issued by the Honorable Lindsey R. Vaala, United States Magistrate for the Eastern District of Virginia (1:25-sw-917-923 (LRV)).

which was parked in the parking garage for the MCCAULEY RESIDENCE, revealed several bags full of fentanyl pills and tablet fragments, a large quantity of suspected marijuana, and suspected cocaine. Later analysis at the DEA Lab confirmed that the pills seized from the Durango contained approximately 721 grams of a mixture and substance containing Carfentanil, 108.8 grams of a mixture and substance containing heroin, and approximately 116 grams of a mixture and substance containing fentanyl.

18. During the search warrant execution at the MCCAULEY RESIDENCE, law enforcement also seized several cellular telephones later determined to be associated with WRIGHT, WHITAKER, MOTEN, and THOMAS. The devices associated with WHITAKER, MOTEN, and THOMAS were searched pursuant the federal search warrant issued for the residence. WRIGHT's phone was extracted pursuant to a Virginia State Search Warrant.

*ii. November 12, 2025, Interview of THOMAS and Currency Seizure*

19. During the execution of the search warrants on November 12, 2025, THOMAS was advised of her *Miranda* rights. THOMAS verbally acknowledged the advisement of her *Miranda* rights. Following execution of the search warrants, THOMAS agreed to speak with law enforcement. During the interview, THOMAS provided law enforcement with her residential address, located on Van Dorn Street in Alexandria, Virginia (hereinafter, the "VAN DORN ST RESIDENCE"). THOMAS subsequently provided consent for law enforcement to search her residence, and later provided consent for law enforcement to open a safe located in the residence. Within the VAN DORN ST RESIDENCE, law enforcement located numerous credit cards which were in the names of individuals other than THOMAS or other members of the DTO, a Maryland ID card in WHITAKER's name, numerous records and documents in THOMAS's name, and $82,470 in U.S. Currency. $15,920 was located in a bedside table along with a Maryland ID in

WHITAKER's name, while the remaining $66,550 was located in the safe located within the residence.

20. When asked about the U.S. currency located in her residence, THOMAS claimed the money belonged to her and was from her hair styling business. THOMAS further stated that she had withdrawn $16,000 in cash from her bank account. When questioned as to whether her bank records would show a $16,000 withdrawal, THOMAS stated they would but "not at one time." When further asked whether she had "structured it," THOMAS replied in the affirmative, stated it was likely done in four withdrawals, and further stated "Every time I go to the bank they say they write it down." THOMAS told investigators, "The teller . . . they said you always document when you take more than 10k." When asked whether she therefore does not withdraw more than $10,000, THOMAS responded in the affirmative. When asked why she cared about the bank "writing it down," THOMAS stated "I don't care about them writing it down."

iii. *THOMAS's Involvement in Vehicle Purchases and Rental Payments for DTO*

21. Review of messages between WHITAKER and THOMAS revealed that WHITAKER requested THOMAS purchase the Mercedes and instructed THOMAS to register the Mercedes in her name.[3] Moreover, during the aforementioned interview on November 12th,

[3] A summary of relevant messages—located in an Apple iCloud return associated with WHITAKER's iCloud accounts—is as follows: On June 30, 2025, WHITAKER told THOMAS: "Tell your uncle find me amg c43." An AMG c43 is a Mercedes-Benz model. In the days and weeks after the Mercedes was purchased, WHITAKER and THOMAS appeared to be in an argument. On July 12, 2025, THOMAS sent WHITAKER several messages regarding a vehicle, making statements such as: "And take my name off the car tf . . . put ts in your name" and "im getting my name off that dumb ass car . . . ." On July 14, 2025, WHITAKER wrote, "Never giving be petty bout my car title." THOMAS responded on the same day, "The f*** are you

THOMAS told investigators that she did "car stuff" for WHITAKER, did the paperwork for the purchase of the Mercedes, and used WHITAKER's cash to purchase the Mercedes.

22.    Additionally, investigation revealed that THOMAS rented the Durango for WHITAKER's use.  An administrative subpoena return from Turo, a rental car company, indicated that the Turo account holder who rented the Durango was a female subject sharing THOMAS's last name.  Turo records further contained a photograph of THOMAS holding her Maryland Driver's License.  I know that Turo requires the user of a vehicle to send a photograph of themselves holding their driver's license as part of the rental process. Moreover, during the aforementioned November 12th interview, THOMAS originally stated she was going to take the Durango with her.  After being told law enforcement seized items from the Durango, THOMAS claimed she did not rent the vehicle and no longer wanted to take it.  In addition to the Mercedes and Durango, investigators queried the Range Rover driven by WHITAKER on February 19, 2025— which was found to contain narcotics, a firearm, and U.S. currency (as further discussed in paragraph 26)—through the Virginia DMV and learned that it was also registered in THOMAS's name.

23.    Moreover,  communications between WHITAKER and THOMAS also indicated that THOMAS was tasked with locating residences for the DTO's use (*i.e.*, "I really need this town house and a new trap before this month over") and making rent payments (*i.e.*, "The rent post yet at the trap"), tasks which are corroborated by THOMAS's Apple Cash records. THOMAS made several rent payments via Apple Cash for two apartments associated with the

---

using me for is to get your car and do shit for you . . . Why you aint ask her to get the car in her name for you."

DTO—an apartment on Woodside Lane in Lorton, Virginia ("WOODSIDE RESIDENCE"), in which WHITAKER resided from on or about September 16, 2025 through November 12, 2025, and an apartment on Fairfield Woods Court in Lorton, Virginia ("FAIRFIELD RESIDENCE"), which was used as a stash location by the DTO starting on or about April 8, 2025 through November 12, 2025.[4] Examples of WHITAKER directing THOMAS as to apartment rentals and rent payments are depicted in the below chart:

| Date/Time | THOMAS | WHITAKER |
|---|---|---|
| 3/30/2025 3:25:16 PM(UTC+0) | | You get the address for the car |
| 3/30/2025 3:25:53 PM(UTC+0) | | We need to go do that asap I left endless shit in there im trying get out |
| | | |
| 6/10/2024 11:37:04 PM(UTC+0) | | I really need this town house and a new trap[5] before this month over |
| 6/10/2024 11:37:25 PM(UTC+0) | Ard I'm trying !!!!!!! | |
| 6/10/2024 11:37:42 PM(UTC+0) | | Na fr I kno thank you 🙏🏾 |

---

[4] On April and May 6, 2025, THOMAS made payments for the WOODSIDE RESIDENCE of $2,516.03 and $2,354.81, respectively. From April through October 2025, THOMAS made 7 monthly payments for the FAIRFIELD RESIDENCE ranging from approximately $2,000 to $2,300/month.

[5] Based on my training and experience, I know a "trap" to be a slang term for a location in which drug traffickers store narcotics, currency, and other items associated with narcotics possession and distribution.

| | | |
|---|---|---|
| 6/10/2024 11:38:08 PM(UTC+0) | You don't appreciate me fr but it cool, you welcome | |
| | | |
| 6/24/2024 7:07:42 PM(UTC+0) | | I forgot to stop and look at some apartments names but ima do it when I go back home |
| 6/24/2024 7:07:56 PM(UTC+0) | Yea plz do when you can I've been waiting | |
| 6/24/2024 7:09:49 PM(UTC+0) | | I got you butbut wyd |
| 6/24/2024 7:10:03 PM(UTC+0) | | The rent post yet at the trap |

*iv. Electronic Evidence Demonstrating THOMAS' Knowledge of Drug Conspiracy*

24. Review of communications between THOMAS and WHITAKER revealed she had knowledge of the nature of the underlying conspiracy, specifically that WHITAKER and his coconspirators were involved in drug trafficking. As an initial matter, communications between THOMAS and WHITAKER indicated that they were involved in a romantic relationship for several years.[6] Moreover, various communications between the two parties demonstrate THOMAS's awareness that WHITAKER's source of income was drug distribution. Some examples of such communications are depicted in the below chart [emphases added].

[6] THOMAS has WHITAKER's first name—Dontavious—tattooed on her neck.

| DATE/TIME | THOMAS | WHITAKER |
|---|---|---|
| 3/10/2024 11:24:29 PM(UTC+0) | Wyd ?! | |
| 3/10/2024 11:30:23 PM(UTC+0) | | **Making these plays** when the id come wyd |
| | | |
| 3/12/2024 2:55:04 AM(UTC+0) | Bruh wya | |
| 3/12/2024 2:55:06 AM(UTC+0) | Tf | |
| 3/12/2024 2:55:53 AM(UTC+0) | | **Making these plays** butbut |
| | | |
| 3/18/2024 2:41:39 AM(UTC+0) | What business it's late. How you going do it. | |
| 3/18/2024 2:46:20 AM(UTC+0) | | Bout have you meet me at the house so I can **catch these plays** ima tell you when to come on |
| 3/18/2024 2:46:31 AM(UTC+0) | Ok | |
| 3/18/2024 2:54:46 AM(UTC+0) | | I might just see you tomorrow I forgot I gotta go to **meet my bmore play** half way and my Woodbridge play butbut |
| | | |
| 4/4/2024 2:29:53 AM(UTC+0) | I'm not sending nun you wanna see me make time | |
| 4/4/2024 2:30:32 AM(UTC+0) | | Bet ima bring the BMW in the morning it's getting late **I'm still making plays** |
| | | |
| 5/11/2024 2:06:19 AM(UTC+0) | Tf you see me texting you | |

| | | |
|---|---|---|
| 5/11/2024 2:07:39 AM(UTC+0) | | Tahjai **I'm still trapping** butbut not with nobody but moni |
| 5/11/2024 2:08:01 AM(UTC+0) | | Soon butbut I'm just standing on business rn |
| | | |
| | | |
| 12/29/2024 12:01:40 AM(UTC+0) | Out eating wyd | |
| 12/29/2024 12:03:04 AM(UTC+0) | | In Woodbridge **trapping** rn what you eating |
| | | |
| 12/31/2024 6:16:03 PM(UTC+0) | In the city doing what ? | |
| 12/31/2024 6:16:09 PM(UTC+0) | Am I going see you tn | |
| 12/31/2024 6:16:48 PM(UTC+0) | | **Trapping** and I just seen you last night booty probably might be outside tonight |
| | | |
| 3/30/2025 2:14:03 AM(UTC+0) | Wyd | |
| | | Shit **trapping** how much the rent right there |
| | | |
| 3/31/2025 2:11:50 PM(UTC+0) | How you ain't get your money from him if you stay at his house ? | |
| 3/31/2025 2:14:54 PM(UTC+0) | | He **made a play** for me glo went to his girl joint he be lien tho he probably pop the pills geeking |
| | | |
| 7/16/2025 1:28:21 AM(UTC+0) | | Wym you kno **im trapping** fuck you think ima just ride around for no reason |

| | | |
|---|---|---|
| 7/16/2025 1:28:47 AM(UTC+0) | No bruh you saying you coming but dont come until late asf | |
| 7/16/2025 1:28:58 AM(UTC+0) | & i be tired and you know i have to work | |
| 7/16/2025 1:29:08 AM(UTC+0) | You just basically coming here to sleep. | |
| 7/16/2025 1:29:18 AM(UTC+0) | | I'm telling you when I'm coming wym **I'm outside making my money** tahjai |

25. In the above conversation, WHITAKER repeatedly tells THOMAS he is "making plays" or "trapping." Based on my training and experience, I know that both terms are slang terms used to describe selling controlled substances. In messages from July 16, 2025, WHITAKER specifically tells THOMAS he is "making my money." Messages such as those from May 11, 2024 ("I'm trapping but[sic] not with nobody by Moni") demonstrate THOMAS's awareness that other coconspirators—in this instance, MOTEN—were drug trafficking with WHITAKER.

26. Messages with coconspirator WRIGHT also demonstrate THOMAS's knowledge of the illegal nature of the DTO's activities. For example, on February 19, 2025, law enforcement made substantial seizures associated with the conspiracy—thousands of fentanyl pills, nearly $200,000, and four firearms were seized from two vehicles and a residence in Alexandria. Identification documents for WHITAKER, MOTEN, and WRIGHT were located in the aforementioned residence. During review of one of WRIGHT's devices, investigators located a conversation between WRIGHT and THOMAS from February 19, 2025. During this conversation, THOMAS provided the name and phone number of a "Va lawyer," WRIGHT

stated, ". . . all our s*** in there," and THOMAS responded, "Yesss . . . It was the fbi bruh . . . It wasn't no regular feds."

### C. THOMAS's Laundering of Drug Proceeds for DTO

27. Review of device extractions, as well as the subsequent review of financial records associated with DTO members revealed that THOMAS conspired with WHITAKER, MOTEN, and WRIGHT to facilitate the receipt of funds from drug trafficking and subsequently transfer and utilize those funds.

28. Financial records relied upon within this affidavit include records from the following institutions or entities:

a. Navy Federal Credit Union ("NFCU") for accounts associated with WHITAKER and THOMAS;

b. PNC Bank for accounts associated with WHITAKER, THOMAS, and WRIGHT;

c. Truist for accounts associated with WHITAKER, THOMAS, and WRIGHT;

d. Wells Fargo for accounts associated with THOMAS; and

e. Apple Cash[7] and Cash App records for accounts associated with WHITAKER, THOMAS,[8] MOTEN, and WRIGHT.

---

[7] Apple Cash is a peer-to-peer money transmitter service built into the Apple iMessage application. Therefore, transactions conducted via Apple Cash will often appear within SMS/MMS conversations on a user's phone.

[8] Review of Apple Cash records demonstrated that THOMAS used false identifying information to open Apple Cash accounts. As verified by the Social Security Administration ("SSA"), THOMAS's actual SSN ends in -6082. However, seven Apple Cash accounts in THOMAS's name that also transacted with WHITAKER, WRIGHT, and MOTEN were opened with an SSN ending in -3465, which has been verified by the SSA as an invalid SSN. An Apple Cash account ending in -4913—which was opened by THOMAS using the invalid SSN—received the entirety

29.     I would submit that there is probable cause to believe that the majority of the transactions described below, whether conducted via Apple Cash, Cash App, cash deposits, or as transfers between WHITAKER and THOMAS's NFCU accounts, are related to the sale of narcotics proceeds.   This conclusion is based in part on the DTO's activities as described throughout the whole of this affidavit, as well as for the below enumerated reasons:

a.  WHITAKER, MOTEN, WRIGHT, and THOMAS do not have any known jobs, ownership interest, or other employment that produce cash (currency) income, with the exception of THOMAS's ownership of her business, Styled By Jai ("SBJ"). However, as described in paragraph 39, cash deposits into SBJ's business account totaled only $880 from 2023 through 2025.

b.  Moreover, a review of wage records for Virginia and Maryland revealed that WHITAKER has not held employment since 2020.  MOTEN similarly had no reported employment.  WRIGHT had reported wages with The Home Doctor since 2025, reporting earnings of $31,877.43 in 2025 and $6,373.70 through the first quarter of 2026.  Prior to 2025, WRIGHT had reported earnings with several other companies, with total reported earnings of $12,679.15 in 2022, $6,249.58 in 2023, and $4,766.86 in 2024. THOMAS had reported wages with Lerner Corporation beginning in 2025, reporting earnings of $45,766.75 in 2025 and $13,919.65 through the first quarter of 2026.  Prior to 2025, THOMAS had reported wages with other employers, totaling $2,619.34 in 2023 and $1,432.22 in 2024.  Moreover, review of her bank records indicated that THOMAS was paid by Lerner Corporation (and other employers) via direct deposit, not via cash or any cash applications.

c.  During the aforementioned interview of THOMAS on November 12, 2025, THOMAS stated that she withdrew cash from her bank accounts in structured transactions. She further indicated that she understood certain reporting requirements might be triggered should she withdraw $10,000 or more in a single transaction. Based upon my training and experience, an individual who intentionally alters their cash deposit or withdrawal activity in order to avoiding reporting requirements, often does so to conceal the source or destination of their funds.

---

($113,044) of the suspected narcotics proceeds transferred from WRIGHT to THOMAS as described in paragraph 36. From my training and experience, I know that individuals often use false identifiers—such as false SSNs—to establish accounts to mask or hide illegal activity, including to hide the source and/or destination of funds.

i. *Communications Regarding Money Payments and Transfers Associated with DTO*

30.     Review of device extractions revealed a substantial volume of communications between WHITAKER and THOMAS, WHITAKER and WRIGHT, and THOMAS and WRIGHT regarding the transfer of currency.  Review of these communications demonstrated that, in an attempt to conceal the ownership of funds, WHITAKER funneled drug proceeds through THOMAS and WRIGHT, regularly directing THOMAS and WRIGHT to receive payments for drug purchases via mobile payment applications.  WHITAKER further directed WRIGHT to send payments to THOMAS and directed THOMAS to transfer funds.  Examples of communications between WHITAKER and THOMAS are depicted in the below chart:

| Date/Time | THOMAS | WHITAKER |
|---|---|---|
| 2/3/2024 11:57:06(UTC+0) | | You send it ? |
| 2/3/2024 11:58:25(UTC+0) | I just sent it | |
| 2/3/2024 11:59:07(UTC+0) | | Send the 80 to lil e |
| | | |
| 4/3/2024 2:32:14 AM(UTC+0) | | Bout add the money to your account send it to lil e |
| 4/3/2024 2:32:27 AM(UTC+0) | | Apple Pay tho first |
| | | |
| 7/31/2024 6:33:36 PM(UTC+0) | Hey daddy seomone Apple Pay me for you? | |
| 7/31/2024 6:36:15 PM(UTC+0) | | Yes add it to my account butbut |

| | | |
|---|---|---|
| 7/31/2024 6:37:12 PM(UTC+0) | ok | |
| | | |
| 12/18/2024 9:55:09 PM(UTC+0) | | Check your cash app |
| 12/18/2024 9:55:21 PM(UTC+0) | | And my folks send that other 500 on Apple Pay |
| 12/18/2024 9:58:16 PM(UTC+0) | What the name<br>On cashapp | |
| 12/18/2024 10:00:22 PM(UTC+0) | | Idk |
| 12/18/2024 10:00:32 PM(UTC+0) | | Check your cash app post to be like 600 |
| 12/18/2024 10:01:42 PM(UTC+0) | | My man name like B or it say ahk |
| 12/18/2024 10:02:17 PM(UTC+0) | It say | |
| 12/18/2024 10:02:34 PM(UTC+0) | [screenshot of $700 CashApp payment] | |
| 12/18/2024 10:02:55 PM(UTC+0) | | He just sent it like 10 min ago |
| 12/18/2024 10:04:53 PM(UTC+0) | All I got | |
| 12/18/2024 10:06:21 PM(UTC+0) | | That's mine he sent 700 |
| | | |
| 3/28/2025 1:14:34 AM(UTC+0) | | 703 477 **** |
| 3/28/2025 1:19:06 AM(UTC+0) | | Bout send 590 send it to em |

| | | |
|---|---|---|
| 3/28/2025 1:20:47 AM(UTC+0) | | And send the other 20 to 202-255-**** |
| 3/28/2025 1:21:52 AM(UTC+0) | Liked "Bout send 590 send it to em | |
| | | |
| 3/31/2025 8:21:41 PM(UTC+0) | | Cash out 800 put it in. My account |
| 3/31/2025 8:29:05 PM(UTC+0) | Liked "Cash out 800 put it in. My account " | |

31. In the above communication from December 18, 2024, THOMAS sent WHITAKER a screenshot of a $700 Cash App payment. Notably, the memo line for the payment displays emojis for hair and nails, indicative of an attempt to conceal the nature of the transaction.

32. During review of WRIGHT's phone extraction, investigators identified messages which indicate that WHITAKER regularly directed WRIGHT to receive payments, via CashApp and Apple Cash, on WHITAKER's behalf. WHITAKER then directed WRIGHT to send the money elsewhere, often to THOMAS. For instance, on September 29, 2025, WRIGHT told WHITAKER, "Aye I sent sis[9] 40 on the app . . ." Following these messages, WRIGHT sent two $40 transactions to THOMAS on CashApp with a Subject of "doe" and $170 to THOMAS's Apple Cash account. Similarly, on November 2, 2025, WRIGHT told WHITAKER, "Bout to send sis $260 and I got $40 on cash for you from that play." Following this message, on the same day, examination of the Apple Cash transfers within WRIGHT's phone revealed that WRIGHT sent

---

[9] THOMAS's phone number is saved in WRIGHT's phone under the contact name of "Sis." WRIGHT frequently refers to THOMAS as "sis" in his messages with WHITAKER.

$260 to THOMAS's Apple Cash account. Moreover, as shown in the below chart, numerous communications from November 2025 depict WRIGHT transferring money on WHITAKER's behalf, typically for transactions in which WRIGHT does not appear to be involved.

| Date | WHITAKER | WRIGHT |
|---|---|---|
| 11/1/2025 | My man send that 300 | |
| 11/1/2025 | | No |
| 11/1/2025 | Bet lmk when sum money cum to your phone | |
| 11/1/2025 | | He sent it |
| 11/1/2025 | | Where you want it to go at |
| | | |
| 11/4/2025 | Send that 1100 to Tahjai | |
| 11/4/2025 | | Nobody sent me nothing Brody |
| 11/4/2025 | You refresh it | |
| 11/4/2025 | | Yes bro |
| 11/4/2025 | 1050 bout come | |
| 11/4/2025 | | Bet |
| 11/4/2025 | Send it to Tahjai rq | |
| 11/4/2025 | | I did bro |
| | | |
| 11/6/2025 | Send that 770 ok cash to my bitch for me | |
| 11/6/2025 | You send that shit? | |
| 11/6/2025 | | Yea |

33. In addition to directives to send payments/funds to THOMAS, WHITAKER also directed WRIGHT to send funds to other individuals on his behalf. Some examples of such communications are depicted in the below chart:

| Date | WHITAKER | WRIGHT |
|---|---|---|
| 3/18/2025 | +1 (202) 210- 5834 | |
| 3/18/2025 | Say from Doe | |
| 3/18/2025 | | Apple Pay |
| 3/18/2025 | Apple Pay | |

| | | |
|---|---|---|
| 3/18/2025 | | Ard[10] |
| | | |
| 4/29/2025 | Send moe 25 say from doe | |
| 4/29/2025 | Apple Pay | |
| 4/29/2025 | | Bet |
| | | |
| 9/5/2025 | [Phone Number ending in -3358] | |
| 9/5/2025 | Send 120 to this number for Doe | |
| 9/5/2025 | | What cashapp |
| 9/5/2025 | Apple Pay | |
| 9/5/2025 | | Bet |
| 9/5/2025 | Say from doe | |

34. Furthermore, review of communications between WRIGHT and his drug customers, in concert with financial records, revealed that WRIGHT transferred funds to THOMAS following drug transactions. For example, between August 27-September 1, 2025, messages depict WRIGHT arranging a transaction with Unindicated Coconspirator 1 ("UCC-1"). The day after the apparent sale, UCC-1 sent WRIGHT $5,100 via Apple Cash. Examination of Apple Cash transfers within WRIGHT's phone revealed that three transfers totaling $5,100 from UCC-1 were sent to WRIGHT on September 2, 2025, at 8:23, 8:24 and 8:26 PM. A short time later, at 9:38 PM, WRIGHT sent $4400 to THOMAS via Apple Cash. Notably, other communications between UCC-1 and WRIGHT indicate that WRIGHT likely sold 4,000 fentanyl pills to UCC-1 and that WHITAKER was the ultimate source of the pills. Based on my training and experience, a payment of $5,100 is consistent with the sale of 4,000 pills.[11]

---

[10] Slang for "alright."

[11] 4,000 fentanyl pills (*i.e.*, four "k packs") at $5,100 results in a price of approximately $1.28 per pill. This pricing is consistent with drug redistributors, like UCC-1, who purchase fentanyl pills in moderate bulk quantities like 4,000 pills, but is higher than pricing for high-level

35.    Finally, messages between THOMAS and WRIGHT revealed that WRIGHT regularly sent THOMAS screenshots with messages indicating that the screenshot depicted something (likely, a payment) for WHITAKER.  For example, WRIGHT's accompanying messages stated, "For taedoe," "Doe," or "Taedoe."   Investigators were unable to review the screenshots sent by WRIGHT because the forensic extraction of WRIGHT's device failed to recover the screenshots.  However, a review of WRIGHT's Cash App transactions revealed that, from December 2024 through November 2025, WRIGHT sent THOMAS at least 72 Cash App transactions.  Of those transactions, 53  totaled $17,106 and included a subject line stating, "doe," one transaction was for $70 with a subject line of  "doe cheeze,", another was for $350 with a subject line of  "taedoe," and one was for $150 with a subject line of "Lu."  Notably, dates for several of the 72 transactions corresponded to messages sent from WRIGHT to THOMAS with corresponding screenshots.  For example, on August 28, 2025, WRIGHT sent THOMAS a screenshot, followed by a message stating simply "Doe."  A review of WRIGHT's Cash App records revealed two Cash App transactions around the same time as his message to THOMAS. Initially, WRIGHT received a $147 transaction from a third party, accompanied by a subject line stating "doe food."  WRIGHT immediately sent $147 to THOMAS via Cash App with the subject line "Doe."  Similarly, on August 22, 2025, WRIGHT sent THOMAS a message stating, "I sent money for bro on cash app," to which THOMAS replied, "Kk I send it to him . . .[t]he $350?" WRIGHT responded to THOMAS's inquiry in the affirmative.  Subsequent review of WRIGHT's

---

redistributors like WHITAKER, who purchased tens of thousands of pills at $0.60-$1.00 per pill. WRIGHT's transfer of $4,400 to THOMAS is likely his payment for the 4,000 pills (which he received at a price of $1.10/per pill), which he then sold for a profit of $700 through his sale to UCC-1.

Cash App records revealed that, on August 22nd, WRIGHT received $350 from third party, with a subject line stating "food." A short time later, WRIGHT sent THOMAS $350 via CashApp, with the subject line "doe."

*ii. Cash Application Transfers Associated with DTO*

36. Apple Cash and Cash App records associated with various coconspirator accounts indicate that the transfers of drug proceeds from WRIGHT to THOMAS occurred with frequency. In total, from 2023 through 2025, WRIGHT received $76,599 in payments via Apple Cash and $241,963 in payments via Cash App ($318,562 total) from individuals other than WHITAKER, MOTEN, or THOMAS. WRIGHT also transferred $190,550 from his Cash App account to his Apple Cash account during this time frame. Over the same time frame, THOMAS received $113,044 in transfers from Wright via 358 Apple Cash transactions and $50,274 in transfers from Wright via 152 Cash App transactions, totaling $163,318. Conversely, during this time frame, WRIGHT only received $10,476 from THOMAS via Apple Cash and/or Cash App. This indicates that WRIGHT's typical workflow was to receive payment via Cash App for narcotics, transfer those funds to Apple Cash, and then transfer those funds to THOMAS.

37. Similarly, MOTEN made significant funds transfers to THOMAS and WRIGHT via Cash App. In total, from 2023 through 2025, MOTEN received $277,121 in payments via Cash App from individuals other than WRIGHT, WHITAKER, or THOMAS. Over the same time frame, MOTEN sent $58,568 to WRIGHT and $21,059 to THOMAS. MOTEN received $23,977 from WRIGHT and $1,630 from THOMAS during this time period. Furthermore, in total, from 2023 through 2025, THOMAS received $64,319 in payments via Apple Cash and $100,432 in payments via Cash App ($164,751 total) from individuals other than WHITAKER, MOTEN, or WRIGHT. Notably, in 2023, Whitaker received $199,398 in payments via Apple Cash from

individuals other than THOMAS, MOTEN, or WRIGHT. However, in 2024 and 2025, WHITAKER received no payments via Cash App or Apple Cash, while WRIGHT and THOMAS received significant payments, further illustrating the conspiracy to conceal the ownership and source of drug proceeds.

38. Illustrations of the above-referenced third-party payments to WHITAKER, MOTEN, WRIGHT, and THOMAS via Apple Cash and Cash App, as well as transfers between coconspirators, during the 2023-2025 timeframe, are depicted below in Tables 1 and 2.

*Table 1: Cash App Funds Received from Third Parties and Transfers Between Coconspirators*

***Total Funds Received from Third Parties***

| Account Owner | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|
| D'MONI MOTEN | $144,371 | $121,696 | $11,054 | $277,121 |
| EDWARD WRIGHT | $18,966 | $62,907 | $160,090 | $241,963 |
| TAHJAI THOMAS | $13,147 | $39,912 | $47,373 | $100,432 |
| **Total** | **$176,484** | **$224,515** | **$218,517** | **$619,516** |

***Total Transfers Sent to Coconspirators***

| Recipient and Sender | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|
| **Transfers Sent From MOTEN to…** | **$10,582** | **$62,550** | **$6,495** | **$79,627** |
| EDWARD WRIGHT | $890 | $56,128 | $1,550 | $58,568 |
| TAHJAI THOMAS | $9,692 | $6,422 | $4,945 | $21,059 |
| **Transfers Sent From WRIGHT to…** | **$ 6,759** | **$23,338** | **$49,534** | **$79,631** |
| D'MONI MOTEN | $139 | $19,636 | $4,202 | $23,977 |
| EDWARD WRIGHT[12] | $118 | $3,002 | $2,260 | $5,380 |
| TAHJAI THOMAS | $6,502 | $700 | $43,072 | $50,274 |
| **Transfers Sent From THOMAS to…** | **$2,535** | **$2,120** | **$620** | **$5,275** |
| D'MONI MOTEN | $630 | $720 | $280 | $1,630 |
| EDWARD WRIGHT | $1,905 | $1,400 | $340 | $3,645 |
| **Total** | **$19,876** | **$88,008** | **$56,649** | **164,533** |

[12] Transfers from an individual to themselves indicate either a transfer between electronic platform accounts owned by that individual or instances where an individual transferred money into the electronic platform from a bank account.

*Table 2: Apple Cash Funds Received from Third Parties and Transfers Between Coconspirators*

***Total Funds Received from Third Parties***

| **Account Owner** | **2023** | **2024** | **2025** | **Total** |
|---|---|---|---|---|
| DONTAVIOUS WHITAKER | $199,398 | | | $199,398 |
| EDWARD WRIGHT | $4,680 | $19,773 | $52,146 | $76,599 |
| TAHJAI THOMAS | $11,867 | | $52,452 | $64,319 |
| **Total** | **$215,945** | **$19,773** | **$104,599** | **$340,316** |

***Total Transfers Sent to Coconspirators***

| **Transfers From/To** | **2023** | **2024** | **2025** | **Total** |
|---|---|---|---|---|
| **Transfers Sent From WHITAKER to…** | **$116,373** | | | **$116,373** |
| DONTAVIOUS WHITAKER[12] | $94,746 | | | $94,746 |
| EDWARD WRIGHT | $7,372 | | | $7,372 |
| TAHJAI THOMAS | $14,255 | | | $14,255 |
| **Transfers Sent From WRIGHT to…** | **$24,430** | **$55,595** | **$115,766** | **$195,790** |
| DONTAVIOUS WHITAKER | $6,585 | | | $6,585 |
| EDWARD WRIGHT[12] | $12,556 | $23,491 | $40,115 | $76,161 |
| TAHJAI THOMAS | $5,289 | $32,104 | $75,651 | $113,044 |
| **Transfers Sent From THOMAS to…** | **$43,679** | | **211,518** | **255,197** |
| DONTAVIOUS WHITAKER | $20,404 | | | $20,404 |
| EDWARD WRIGHT | | | $6,831 | $6,831 |
| TAHJAI THOMAS[12] | $23,275 | | $204,687 | $227,962 |
| **Total** | **$184,482** | **$55,595** | **$327,283** | **$567,360** |

*iii. Cash Deposits Associated with DTO*

39. In addition to cash application payments, WHITAKER and MOTEN also received cash payments for their narcotics sales. From 2023 through 2025, $291,229 in cash was deposited into accounts owned by WHITAKER, WRIGHT, and THOMAS, as follows:

a. $126,249 was deposited into WHITAKER's personal bank accounts at PNC Bank and NFCU;

b. $120,482 was deposited into THOMAS' personal bank accounts at PNC Bank, NFCU, Wells Fargo, and Truist;

c. $6,915 was deposited into WRIGHT's personal bank account at Truist;

d. $36,703 was deposited into a business bank account for THE RIGHT WAY ("TRW") at Truist;[13] and

e. $880 was deposited into a business bank account for SBJ, a business created by THOMAS for hair and nail care.

*iv. NFCU Transfer Activity between THOMAS and WHITAKER*

40. WHITAKER and THOMAS engaged in substantial transfer activity to and from personal and business bank accounts with NFCU. Review of NFCU records revealed that THOMAS and WHITAKER directly sent each other funds with frequency, often making multiple transfers on the same day in both directions. Based on my training and experience, I know that engaging in such a high frequency of transfers, particularly on the same day, is intended to mask the starting and ending points of funds in order to conceal the source, ownership, and control of those funds. An example of such activity occurred on July 13, 2023, as described below:

a. On July 13, 2023, THOMAS deposited almost $4,000 into her personal bank account at NFCU ending in x1115 via a combination of Cash App transfers and four separate cash deposits;

b. On the same date, WHITAKER deposited almost $1,900 into his personal NFCU account ending in x1316 via Apple Cash transfers;

c. THOMAS then sent $2,900 from her NFCU account to WHITAKER's NFCU account via three transactions;

d. Whitaker sent $800 from his NFCU account to THOMAS's account via two transactions;

e. The net effect of the transactions resulted in Whitaker receiving $2,100 from THOMAS on July 13, 2023.

---

[13] TRW is an LLC for which WHITAKER's mother is the listed account owner. However, based on review of communications between WHITAKER, MOTEN and WHITAKER's mother, investigators believe TRW to have been created by WHITAKER's mother on behalf of WHITAKER.

41.     Similarly, on June 9, 2025, WHITAKER and THOMAS engaged in a series of transactions via their personal bank accounts at NFCU intended to conceal the source, ownership, and destination of their funds:

   a.  THOMAS deposited $2,026 via six Apple Cash transactions and transferred $3,542 to her Apple Cash account via three transactions, for a net transfer of $1,516 from her NFCU account to her Apple Cash account;

   b.  WHITAKER deposited $1,950 via one cash deposit into his NFCU account;

   c.  WHITAKER transferred $5,352 from his NFCU account to THOMAS's NFCU account across 22 transactions, and received $5,289 from THOMAS in the same manner across 8 transactions, for a net transfer of $63 from WHITAKER to THOMAS; and

   d.  The net effect of these 40 transactions resulted in an increase of $1,887 into WHITAKER's NFCU account, a decrease of $1,453 in THOMAS' NFCU account, and an increase of $1,516 in THOMAS' Apple Cash account.

42.     In total, from 2023 through 2025, WHITAKER sent $268,096 to THOMAS directly through their NFCU accounts, and THOMAS sent $280,790 to WHITAKER in the same manner. The net effect of the transfers was minimal over that time frame. Based on my training and experience, the only reason to engage in those transfers, when the net effect of funds transfer is negligible, was to attempt to conceal the source, ownership, and control of the funds, therefore concealing that the funds originated from drug proceeds.

## II.    VIOLATION OF 18 U.S.C. § 1028A (AGGRAVATED IDENTITY THEFT)

43.     Review of THOMAS's devices seized on November 12, 2025 revealed numerous conversations, notes, emails, and other documents containing personal identifying information ("PII") not belonging to THOMAS.  Further review of the PII contained on THOMAS's devices

indicated that, while some of the PII was falsified (*i.e.*, was not associated with actual individuals), some PII possessed by THOMAS belonged to other individuals.

**A. <u>THOMAS's Use of V1's PII to Obtain Personal Loan</u>**

44. While reviewing THOMAS's devices, investigators observed that THOMAS synced various email accounts with her cellular device(s). One of the accounts synced to THOMAS's device(s) was m****d****959@gmail.com (hereinafter, the "SUBJECT EMAIL ACCOUNT"). Because the SUBJECT EMAIL ACCOUNT was synced with THOMAS's devices, investigators were able to review emails retained on the devices which were sent and received by the SUBJECT EMAIL ACCOUNT. Investigators located a series of emails from April 2025 between the SUBJECT EMAIL ACCOUNT and Chartway Federal Credit Union ("CFCU"), a bank incorporated in Virginia Beach, Virginia, and a financial institution as defined by Title 18, United States Code, Section 20. These emails indicated that the SUBJECT EMAIL ACCOUNT was utilized to obtain a personal loan with CFCU.

45. Within THOMAS's device(s), investigators located a notes document containing PII for M.D.[14] (hereinafter, "V1"), to include V1's date of birth ("DOB"), social security number ("SSN"), and home address. Investigators also located an image of a Virginia Driver's license in V1's name (hereinafter, the "SUBJECT LICENSE"). Investigators queried the Operator License Number (OLN) depicted on the SUBJECT LICENSE which revealed that the OLN was never issued by the Virginia Department of Motor Vehicles, indicating that the SUBJECT LICENSE

---

[14] M.D. was V1's maiden name.

was fraudulent. Investigators further determined that the image depicted on the SUBJECT LICENSE did not look like V1.

46.    Subsequently, investigators obtained records associated with the suspected loan from CFCU. The loan application was electronically submitted on April 21, 2025, with a requested amount of $15,000. The "Applicant" section of the loan contained V1's maiden name, V1's SSN, V1's DOB, the SUBJECT EMAIL ADDRESS, and V1's address. CFCU records indicated that the loan was approved and paid out on April 22, 2025. CFCU records also included an image provided by the loan applicant which was intended to depict the applicant's driver's license. This image was identical to the SUBJECT LICENSE located in THOMAS's device. CFCU records further included an Affidavit of Forgery submitted by V1 relating to the April 22nd loan. The Affidavit indicated that V1 did not know who forged her signature or made the fraudulent transaction.

47.    On June 2, 2026, investigators interviewed V1, who had previously filed a police report on July 15, 2025, with Fairfax County Police Department regarding the fraudulently obtained loan with CFCU. V1 confirmed that her identity was used, without her permission, to obtain a loan with CFCU. V1 also indicated that the SUBJECT EMAIL ACCOUNT was not an account that V1 had ever used. On June 25, 2026, V1 spoke with investigators again and confirmed the following identifying information, which will be masked here for V1's privacy: SSN ("V1 SSN"), DOB ("V1 DOB"), Residential Address ("V1 ADDRESS"). V1's SSN, DOB and ADDRESS are identical to those used on the April 21st CFCU loan application. V1 was shown the CFCU loan application and confirmed that she had neither completed this application nor given permission for someone else to complete this application using her PII. V1 was also shown a

picture of the SUBJECT LICENSE and confirmed that the photo of the individual depicted on the SUBJECT LICENSE was not V1.

**B. <u>THOMAS's Conversation with UCC-2 Regarding Bank Fraud</u>**

48. Additionally, a review of THOMAS's devices revealed the following conversation (not depicted in its entirety) between THOMAS and Unindicted Coconspirator 2 (hereinafter, "UCC-2") in the Telegram application.[15]

| Date/Time | THOMAS | UCC-2 |
|---|---|---|
| 5/29/2025 8:37:30 PM(UTC+0) | | Can we still work ? |
| 5/29/2025 8:37:40 PM(UTC+0) | | And make some money together |
| 5/29/2025 8:38:09 PM(UTC+0) | | I remember u setup a vanguard then !! If u still have it we can still get bag 💼 |
| 5/29/2025 9:09:06 PM(UTC+0) | I dont have nothing | |
| 5/29/2025 9:09:18 PM(UTC+0) | At all nomore account i cant set up nothing | |
| 5/29/2025 9:09:37 PM(UTC+0) | I need pros im doing personal loans nd wiping them w open ups | |
| 5/29/2025 9:09:43 PM(UTC+0) | Do you have so pros | |
| 5/29/2025 9:09:46 PM(UTC+0) | Women w ids | |

[15] Telegram is a messaging application that allows users to communicate both privately and with large audiences. Users can send messages, share media, and engage in video calls and voice chats. One of Telegram's features is "Secret Chats," which are more private than group chats, because they support "self-destructing" messages and are end-to-end encrypted.

| | | |
|---|---|---|
| 5/29/2025 9:09:53 PM(UTC+0) | Withi good credit score | |
| 5/29/2025 9:22:56 PM(UTC+0) | | I have some |
| 5/29/2025 9:23:22 PM(UTC+0) | | If I give u one high credit score what can u do with them |
| 5/29/2025 9:25:22 PM(UTC+0) | | Did u have someone who help with ID ? |
| 5/29/2025 10:26:53 PM(UTC+0) | I can apply with any banks thats going to | |
| 5/29/2025 10:27:13 PM(UTC+0) | I did chartway | |
| 5/29/2025 10:28:35 PM(UTC+0) | Bank one of them | |
| 5/29/2025 10:41:36 PM(UTC+0) | | U have a chartway bank now |
| 5/29/2025 10:42:05 PM(UTC+0) | | How much loan u applying for |
| 5/29/2025 11:21:33 PM(UTC+0) | No | |
| 5/29/2025 11:21:39 PM(UTC+0) | I do 10-15 | |
| 5/29/2025 11:21:47 PM(UTC+0) | As long as the credit unlocked | |
| 5/29/2025 11:21:56 PM(UTC+0) | I need females with id | |
| 5/29/2025 11:22:05 PM(UTC+0) | & i can get the rest of info | |
| 5/29/2025 11:22:09 PM(UTC+0) | | Will sendnu some |

| | | |
|---|---|---|
| 5/29/2025 11:22:15 PM(UTC+0) | I just there name address and id | |
| 5/29/2025 11:22:19 PM(UTC+0) | I apply tn | |
| 5/29/2025 11:22:31 PM(UTC+0) | Because it's Thursday so im trying to do atleast 4 | |
| 5/29/2025 11:22:33 PM(UTC+0) | Tonight | |
| 5/29/2025 11:22:41 PM(UTC+0) | You have a photo of there idk | |
| 5/29/2025 11:22:50 PM(UTC+0) | And make sure the credit its high | |
| 5/29/2025 11:22:56 PM(UTC+0) | & age is 30-45 | |
| 5/29/2025 11:32:16 PM(UTC+0) | | Old age only |
| 5/29/2025 11:32:26 PM(UTC+0) | Well its good | |
| 5/29/2025 11:32:38 PM(UTC+0) | Do you wanna work or no i need to start tn | |
| 5/29/2025 11:32:46 PM(UTC+0) | Send them immediately | |
| 5/29/2025 11:32:58 PM(UTC+0) | I need to see if there credit good and unlocked | |
| 5/30/2025 10:18:43 AM(UTC+0) | | 801 credit score |
| 5/30/2025 12:13:57 PM(UTC+0) | Bet ima see now if her shit unlcoked send me more perfect | |
| 5/30/2025 12:14:11 PM(UTC+0) | I need her job | |

| | | |
|---|---|---|
| 5/30/2025 12:16:32 PM(UTC+0) | | Tell me all you need to know |
| 5/30/2025 12:45:04 PM(UTC+0) | Address<br>Id<br>Job<br>Age | |

49. Based on my training, experience, and knowledge of this investigation, the above conversation depicts THOMAS and UCC-2 discussing fraudulently obtaining loans using PII belonging to other individuals. THOMAS relayed to UCC-2 her need for "pros," which I know to be a slang term used to describe the personal identifiers of other persons. THOMAS told UCC-2 that she was "doing personal loans," and was looking for PII for female subjects with good credit, ideally between the ages of 30-45. THOMAS explained to UCC-2 that she could apply for bank loans if the credit was unlocked[16] for the individual associated with the PII being used. Notably, THOMAS then told UCC-2 "I did chartway," an apparent reference to the CFCU loan THOMAS fraudulently obtained merely a month prior. Moreover, when asked by UCC-2 about loan size, THOMAS stated, "I do 10 15"—which is consistent with the $15,000 loan she obtained from CFCU.

<CONTINUED ON NEXT PAGE>

[16] A credit lock prevents credit bureaus from approving lines of credit without an individual unlocking their credit to allow creditors to conduct credit checks. Credit locks therefore reduce the opportunity for bad actors to use others' credit to fraudulently open financial accounts, loan or lease applications, or other forms of credit.

C. **Further Evidence of THOMAS's Possession of PII**

50. Further review of THOMAS's device revealed numerous other conversations discussing how to conduct various forms of fraud and identity theft.

51. Law enforcement also located numerous "Notes" saved on THOMAS's devices which contained lists of PII not belonging to THOMAS.[17] For example, one such note, created on April 24, 2025, was titled "Maryland / Female / 1973 / 779 - 10$" The body of the note contained a list of PII for two other individuals, including names, DOBs, SSNs, and lists of previous addresses. Another note, created March 27, 2025 and titled T*** A L*******, contained a list of PII for two other individuals, including names, DOBs, email addresses, and SSNs. Similarly, a note created February 17, 2025 and titled J****** L*** B****, contained a list of PII for seventeen other individuals including names, DOBs, email addresses, SSNs, email addresses, phone numbers, and passwords.

**CONCLUSION**

52. Based on the foregoing, I submit that there is probable cause to believe that from at least January 2023 through November 12, 2025, in the Eastern District of Virginia and elsewhere, Tahjai THOMAS did conspire with Dontavious WHITAKER, D'Moni MOTEN, Edward WRIGHT III, and others known and unknown to launder monetary instruments, in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Monetary Instruments), and conducted financial transactions to conceal or disguise the nature, location, source, ownership, or control of property represented to be the proceeds of specified unlawful activity, in violation of 18 U.S.C.

---

[17] Investigators do not have information as to whether the PII contained in these notes is real or fraudulent, nor are any of the individuals listed in the notes known to law enforcement.

§ 1956(a)(1)(B)(i) (Concealment Money Laundering). I submit that there is also probable cause to believe that, on or about April 21-22, 2025, in the Eastern District of Virginia and elsewhere, THOMAS did knowingly and intentionally transfer, possess, or use, without lawful authority, the means of identification of another person, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit bank fraud (18 U.S.C. § 1344), in violation of Title 18, United States Code, Section 1028A.

Respectfully submitted,

Patrick Maxwell

Task Force Officer Patrick Maxwell
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on June 30, 2026.

Lindsey R Vaala Digitally signed by Lindsey R Vaala
Date: 2026.06.30 11:33:47 -04'00'

The Honorable Lindsey R. Vaala
United States Magistrate Judge